# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ENTERGY GULF STATES LOUISIANA, LLC AND ENTERGY TEXAS, INC. | CIVIL ACTION |
| VERSUS | 14-385-SDD-RLB |
| LOUISIANA GENERATING, LLC | |

## RULING

This matter is before the Court on the *Motion for Partial Summary Judgment*[1] filed by Defendant, Louisiana Generating LLC ("LaGen"). Plaintiffs, Entergy Gulf States Louisiana LLC and Entergy Texas, Inc. (collectively "Entergy") filed an *Opposition*,[2] to which LaGen filed a *Reply*.[3] Entergy also filed a *Sur-Reply*.[4] For the following reasons, the Court finds that the *Motion* should be GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

LaGen and Entergy co-own Unit 3 of the Big Cajun II power plant in New Roads, Louisiana.[5] Their co-ownership is governed by a contract: the Joint Ownership Participation and Operating Agreement ("JOPOA").[6] Entergy brought this suit in 2014, alleging breach of certain provisions of the JOPOA and seeking, *inter alia*, recovery of costs it paid in connection with the installation of a pollution control device on Unit 3 at Big Cajun II. Although this almost seven-year-old case encompasses a number of complex disputes between the parties, the instant *Motion* is narrow in scope. It concerns

---

[1] Rec. Doc. No. 202.
[2] Rec. Doc. No. 209.
[3] Rec. Doc. No. 218.
[4] Rec. Doc. No. 223.
[5] Rec. Doc. No. 158, ¶ 8-11.
[6] Rec. Doc. No. 202-3.
65495

only one of Entergy's claims – Claim Six, wherein Entergy invokes Article 9 of the JOPOA to seek certain default damages. In Claim Six, Entergy alleges that LaGen "has been in default of its obligations under the JOPOA since 2012."[7] Entergy argues that it is entitled to "a judgment awarding them the value of the energy that Louisiana Generating received from Unit 3 of the Plant from 2012 until the time that Louisiana Generating cures its default under the JOPOA,"[8] because Section 9.3 of the JOPOA establishes that "[a] Co-owner in default shall have no right to any output of capacity or energy from the Coal Unit 3 or to exercise any other rights under this Agreement until all monetary payments have been made, together with interest, and all duties and obligations have been performed."[9]

In the instant *Motion*, LaGen urges the Court to dismiss Entergy's Claim Six because, it argues, "[n]othing in the JOPOA allows Entergy to recover money damages measured by the value of the energy that LaGen received from Unit 3."[10] According to LaGen, the specified remedy for a default is "interest, specific performance and indemnity for losses,"[11] and the "value of energy" remedy for default set forth in Section 9.3 only applies under limited circumstances not found here. While it concedes that, under the JOPOA, a defaulting co-owner "shall have no right to any output of capacity or energy from the Coal Unit 3,"[12] LaGen argues that that statement "does not translate"[13] into a right of the non-defaulting co-owner to *take* the monetary value of the output, "except under the limited circumstances and preconditions set forth" in the related JOPOA

---

[7] Rec. Doc. No. 158 (*Second Supplemental and Amending Complaint*) p. 24.
[8] *Id*.
[9] *Id*.
[10] Rec. Doc. No. 202-4, p. 7.
[11] *Id*.
[12] Rec. Doc. No. 202-3, p. 92.
[13] Rec. Doc. No. 202-4, p. 8.
65495

provisions. Entergy disagrees, relying on various provisions from Article 9 of the JOPOA that, it claims, "demonstrate[] [its] rights to proceeds from LaGen's share of electricity output produced at Unit 3."[14] After reviewing the parties' briefs and the applicable law, the Court finds that the default damages sought by Entergy in Claim Six are not available to it under the terms of the JOPOA.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[15] This determination is made "in the light most favorable to the opposing party."[16] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[17] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[18] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[19]

---

[14] Rec. Doc. No. 209, p. 7.
[15] FED. R. CIV. P. 56(a).
[16] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[17] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[18] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[19] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
65495

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[20] All reasonable factual inferences are drawn in favor of the nonmoving party.[21] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[22] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[23]

### B. Contract Interpretation

The JOPOA provides that "[t]he validity, interpretation, and performance of this Agreement shall be governed by the Laws of the State of Louisiana."[24] "Under Louisiana law, the interpretation of a contract is a question of law for the court."[25] The goal of contract interpretation is to determine the objective common intent of the parties.[26] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[27] Contracts should be interpreted to give effect to each provision.[28] "Each provision in a contract must be

---

[20] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[21] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[22] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[23] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[24] Rec. Doc. No. 202-3, p. 75.
[25] *Petro-Marine Underwriters, Inc. v. Cox Operating, LLC*, No. 2:17-CV-09955, 2021 WL 40186, at *2 (E.D. La. Jan. 5, 2021).
[26] La. Civ. Code art. 2045, cmt (b).
[27] La. Civ. Code art. 2046; See *Maloney v. Oak Builders, Inc.*, 235 So.2d 386 (1970).
[28] La. Civ. Code art. 2049.

interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[29] Specific provisions control over general.[30]

### C. Analysis

The question presented by this *Motion* is whether, assuming *arguendo* that a default has occurred,[31] the JOPOA enables Entergy to seek default damages in the form of the monetary value of energy received by LaGen from Unit 3. The issue of default and remedies for such is addressed in Article 9 of the JOPOA. Article 9.2, entitled "Remedy," sets forth a number of actions that the co-owner in default "shall" take "in order to remedy any default."[32] But Entergy looks elsewhere in Article 9 to make its case that, as a remedy for LaGen's alleged default, it is entitled to proceeds from LaGen's share of Unit 3's output. Specifically, Entergy cites Article 9.3, which provides as follows:

> 9.3 Loss of Rights: A Co-owner in default shall have no right to any output of capacity or energy from the Coal Unit 3 or to exercise any other rights under this Agreement until all monetary payments have been made, together with interest, and all duties and obligations have been performed.[33]

The parties do not dispute that, under certain circumstances, the above provision applies to a defaulting co-owner. Their disagreement arises out of (among other things) the meaning of Article 9.3 when read alongside Article 9.5, which, Entergy claims, provides authorization "to sell off the defaulting party's . . .share of output and distribute some of those proceeds to the non-defaulting party."[34]

---

[29] La. Civ. Code art. 2050.
[30] *Mixon v. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn.*, 147 La. 302, 306, 84 So. 790, 791 (1920); *Master Craft Constr., LLC v. Pronoun, Inc.*, 2017-569 (La. App. 3 Cir. 12/20/17), 258 So. 3d 802, 807.
[31] LaGen clarifies that "For purposes of this motion, LaGen pretermits the question of whether a default has occurred . . ." to allow the Court to focus on the purely legal question of whether Entergy's claimed remedy is available to it under the JOPOA. (Rec. Doc. No. 202-4, p. 14).
[32] Rec. Doc. No. 202-3, p. 91.
[33] Rec. Doc. No. 202-3, p. 92.
[34] Rec. Doc. No. 209, p. 8.
65495

As an initial matter, LaGen argues that the Court should not consider any argument related to Article 9.5 because Entergy did not specifically reference that sub-section of the JOPOA in its *Second Supplemental and Amending Complaint*.[35] Per LaGen, because Entergy's alleged entitlement under Article 9.5 was raised for the first time only in response to the *Motion for Summary Judgment*, the Court should disregard it. Entergy disagrees and asserts that its "citation to Article 9.5 in its opposition memorandum is not the assertion of a new *claim*."[36] The claim, it explains, is for breach of contract, and that claim "encompasses Article 9 remedies."[37] LaGen clearly knew that Article 9.5 was relevant to the claim, Entergy notes, since its *Memorandum in Support* of the instant motion cited it and highlighted the importance of reading the Article 9 provisions *in pari materia* with one another. On this issue, the Court agrees with Entergy. It would be a misstatement of pleading standards and civil procedure to suggest that the *Complaint* must reference every source of law that may be marshalled in support of the Plaintiff's claim. Thus, Entergy's discussion of Article 9.5 will be considered by the Court. The Article reads as follows:

> 9.5 Sale of Capacity and Energy Entitled to Defaulting Co-owner: In the event a Co-owner is in default, [LaGen], as agent for the other Co-owners, may sell any output of capacity and energy of Coal Unit 3 which the Co-owner in default is entitled. . .[38]

According to LaGen, Article 9.5 applies "only when the defaulting co-owner is **not** the Project Manager and agent."[39] It is undisputed that, under the JOPOA, LaGen "is the

---

[35] Rec. Doc. No. 158.
[36] Rec. Doc. No. 223, p. 1 (emphasis added).
[37] *Id*. at p. 2.
[38] Rec. Doc. No. 202-3 at p. 93.
[39] Rec. Doc. No. 202-4, p. 17 (emphasis original).
65495

Project Manager and agent for the other co-owners."[40] Article 4.1 provides that LaGen as agent may "take all actions . . .which, in the absolute discretion and judgment of [LaGen] . . .are deemed necessary. . ."[41] Therefore, LaGen contends, the sale of output can only be undertaken at its discretion. In Entergy's view, this interpretation cannot be correct because it disregards certain language in subsequent sentences of Article 9.5. For example, if the JOPOA truly provided for the sale of capacity to be carried out only at LaGen's discretion, Entergy questions why Article 9.5 would further specify that

> Such *sales by the non-defaulting Co-owners shall be made on such terms and for such period . . .deemed necessary in their judgment*, which shall not be exercised unreasonably, to accomplish such sale under then existing market conditions and recover the amounts provided for this in this section.[42]

In Entergy's view, this provision clearly establishes that it "may choose to invoke Article 9.5 and direct LaGen, as agent for Entergy, to sell the output of LaGen."[43] Further, it contends that this reading "is superior because it gives effect to and harmonizes" all of the provisions of Article 9.5, while LaGen's proffered interpretation, which puts all of the power in the hands of the agent, renders meaningless the language establishing "the non-defaulting co-owners' rights to demand sales '*in their judgment*.'"[44]

LaGen additionally argues that the above sentence from 9.5 does not apply to the instant scenario because it contemplates three separate parties -- LaGen as agent, a co-owner in default, and "other co-owners" – not the situation present here, where the agent and defaulting party are one and the same. Thus, LaGen asserts that 9.5 clearly

---

[40] Rec. Doc. No. 202-3, p. 52.
[41] *Id*.
[42] *Id*. at p. 94.
[43] Rec. Doc. No. 209, p. 11.
[44] *Id*. at p. 12. (emphasis added).
65495

"envisions that the co-owner in default, the agent, and the other co-owners **are different persons or entities**."[45] As LaGen explains, this tripartite structure is likely a remnant of the fact that, when the JOPOA was drafted, there were three parties to the agreement, not two as there are now.[46]

Overall, the Court agrees with LaGen that Article 9.5 is inapplicable to the instant dispute because it only addresses a scenario where LaGen acts as agent for another co-owner, not "when it acts for itself and sells it own share of the output."[47] One indication that Entergy's interpretation of 9.5 is amiss is the permissive language used therein. The first sentence of 9.5 provides that "[i]n the event a Co-owner is in default, [LaGen], as agent for the other Co-owners, *may* sell any output of capacity and energy of Coal Unit 3. . ."[48] Entergy contends that Article 9.5 allows non-defaulting co-owners "to *demand* the sales [of the defaulting co-owner's share of output] according to their own judgment,"[49] but, by the use of the permissive language "*may* sell," Article 9.5 clearly establishes that the power to sell or not sell lies with LaGen as agent.

The scenario in which the defaulting co-owner and the agent are the same entity is *actually* addressed, LaGen contends, by yet another article: Article 9.7. Article 9.7 reads:

> 9.7 Co-owners' Option for [LaGen] to Continue as Project Manager and Agent: In the event [LaGen] is the defaulting Co-owner, [LaGen], as Project Manager and agent for the other Co-owners, shall continue to plan, license, acquire permits, design, construct, complete, operate, maintain, and dispose of Coal Unit 3 in accordance with the provisions of this Agreement, subject to the right of the non-defaulting Co-owners to appoint another

---

[45] Rec. Doc. No. 218, p. 8 (emphasis original).
[46] Rec. Doc. No. 218, n. 15.
[47] Rec. Doc. No. 218, p. 9.
[48] Rec. Doc. No. 202-3 at p. 93 (emphasis added).
[49] Rec. Doc. No. 209, p. 12 (emphasis added).
65495

> Project Manager and agent to act during the period, and only during the period that such default remains unremedied.[50]

LaGen correctly notes that 9.7 is the only provision in Article 9 "specifically addressing the situation where the Project Manager and agent. . .is the defaulting co-owner."[51] Unless and until Entergy appoints another agent, LaGen argues that, under the plain language of 9.7, LaGen "may continue to operate Unit 3 'in accordance with' the JOPOA, which provides that LaGen and Entergy share the energy output and related costs on a pro rata basis based upon their respective ownership interests."[52] The Court is persuaded by LaGen's argument that 9.7 is the controlling provision in this situation. If Article 9.5 applied even when the party in default was the Project Manager and Agent, 9.7 would be rendered superfluous. It is well-settled that specific provisions in a contract control over general ones.[53] And, as Entergy itself noted, a correct interpretation of a contract is one that "gives effect to and harmonizes" all of the provisions therein. Embracing Entergy's interpretation of Article 9.5 to find that these default damages are provided for would require this Court to ignore a more specifically applicable provision that addresses the situation of default by the agent. It is true, as Entergy argues, that the remedies in Article 9 are "cumulative"[54] and not mutually exclusive, but overall, the Court finds that Entergy has not offered a plausible argument that 9.5 applies under these circumstances or entitles it to take the monetary value of LaGen's output.

---

[50] Rec. Doc. No. 202-3, p. 97.
[51] Rec. Doc. No. 202-4, p. 17.
[52] *Id*. at p. 18.
[53] *Mixon v. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn*., 147 La. 302, 306, 84 So. 790, 791 (1920); *Master Craft Constr., LLC v. Pronoun, Inc*., 2017-569 (La. App. 3 Cir. 12/20/17), 258 So. 3d 802, 807.
[54] Rec. Doc. No. 202-3, p. 100.
65495

In this Court's view, Article 9.3, standing alone, fails to establish Entergy's entitlement to the relief it seeks in Claim Six. 9.3 provides only that the defaulting co-owner "shall have no right to any output of capacity or energy from the Coal Unit 3"[55] – it does not set forth a corresponding right of the non-defaulting co-owner to sell the capacity lost by the co-owner in default. Article 9.5 brings Entergy closer to its mark insofar as it sets forth a procedure for selling the capacity of the defaulting co-owner, but LaGen makes a convincing case that 9.5 does not apply to the situation at hand, where the defaulting co-owner is also the Project Manager and agent. That situation is explicitly addressed by 9.7, and 9.7 makes clear that the remedy available to Entergy is to remove LaGen as Project Manager and agent. Until then, the JOPOA requires the Project Manager and agent in default to "continue to plan, license, acquire permits, design, construct, complete, operate, maintain, and dispose of Coal Unit 3 in accordance with the provisions of this Agreement."[56] In short, while the JOPOA provides that LaGen as the defaulting co-owner loses its right to output from Unit 3, it is apparent that, under the circumstances present here, the JOPOA provides no corresponding ability for Entergy to sell or to demand the sale of the output. Even if such a demand were provided for, the JOPOA is clear that the agent "*may*" – not must – sell that output.

Overall, the Court finds that the *Motion* shall be granted because LaGen has successfully demonstrated that, as a matter of law, the default damages sought by Entergy in Claim Six are not available to it under the JOPOA, which has the effect of law between the parties. Accordingly, Claim Six shall be dismissed from the *Second*

---

[55] Rec. Doc. No. 202-3, p. 92.
[56] *Id*. at p. 97.
65495

*Supplemental and Amending Complaint*. The Court does not reach Entergy's alternative argument that the relief sought in Claim Six constitutes impermissible stipulated damages.

## III.   CONCLUSION

For the reasons set forth above, the *Motion for Partial Summary Judgment*[57] is hereby GRANTED and Claim Six dismissed from Entergy's *Second Supplemental and Amending Complaint*.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on February 23, 2021.

*[signature]*

SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[57] Rec. Doc. No. 202.
65495